# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARTIN AGUILAR,

       Plaintiff,

v.                                       No. CIV 14-808 JAP/LAM

HARDING COUNTY, NEW MEXICO,
REBECCA SMITH, NICK ARCHULETA, and
HAROLD MACKEY, individually and in their
capacities as Harding County Commissioners,

       Defendants.

## MEMORANDUM OPINION AND ORDER

On September 22, 2015, Harding County, Rebecca Smith, Nick Archuleta, and Harold Mackey (Defendants) filed DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY (Motion for Summary Judgment) (Doc. No. 67), asking for dismissal of all of Plaintiffs' claims. On October 16, 2015, Martin Aguilar (Plaintiff) filed PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY; AFFIDAVIT PURSUANT TO *FED. R. CIV. P.* 56(D) (Response) (Doc. No. 72), arguing that genuine disputes of material fact preclude summary judgment. In DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY (Doc. No. 77), Defendants assert that Plaintiff failed to raise genuine disputes of material fact and that there is no reason to "prolong" this case any longer.

On November 30, 2015, the Court entered a MEMORANDUM OPINION AND ORDER (Doc. No. 84), finding that Plaintiff was entitled to obtain additional discovery in the form of

limited depositions of the three individual Defendants in order to fully responding to the Motion for Summary Judgment. The Court allowed both parties until January 12, 2016, to file supplemental briefs in support of their summary judgment positions. *See* PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY (Plaintiff's Supplemental Brief) (Doc. No. 90); DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF SUMMARY JUDGMENT (Defendants' Supplemental Brief) (Doc. No. 91). The Court has carefully considered the pertinent law, along with the parties' briefs and exhibits.[1] Although it is a close call, the Court concludes that genuine disputes of material fact exist that preclude summary judgment. Therefore, the Court will deny Defendants' Motion for Summary Judgment.

## Background

This lawsuit arises from Plaintiff's employment as the Harding County Road Superintendent (Road Superintendent) from December 30, 2013 until his employment was terminated on June 10, 2014. Plaintiff's COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (Complaint) (Doc. No. 1) sets forth two claims against Defendants: (1) First Amendment violations under 42 U.S.C. § 1983; and, (2) New Mexico Whistleblower Protection Act violations under NMSA 1978 § 10-16C-1 (Whistleblower Act). Plaintiff alleges that Defendants terminated his employment in retaliation for his exercise of free speech concerning Plaintiff's

---

[1] Plaintiff asks the Court to strike some or all of the 107 pages of exhibits that Defendants attached to their Supplemental Brief because Defendants exceeded the 50-page limit for exhibits without obtaining Plaintiff's consent or a Court Order. PLAINTIFF'S OBJECTION TO DEFENDANTS' EXHIBITS ATTACHED TO THEIR SUPPLEMENTAL BRIEF IN SUPPORT OF SUMMARY JUDGMENT IN VIOLATION OF D.N.M.LR-Civ. 10.5 (Plaintiff's Objections) (Doc. No. 92). Defendants filed a Response in opposition to Plaintiffs' Objections. [Doc. No. 96]. The Court observes that the parties actually attached a similar <u>total</u> number of pages from the three deposition transcripts. The difference is that each page Plaintiff attached contains four deposition transcript pages while each page Defendants attached contains a single deposition transcript page. Although Defendants should have obtained Plaintiff's consent or a Court Order to exceed the exhibit page allowance, under the circumstances, the Court will overrule Plaintiff's Objections and deny the request to strike.

belief that Defendants "had obtained state funding for specific road projects and then used those funds for other purposes." Complaint ¶ 8.

Defendants argue that it quickly became clear during Plaintiff's short tenure as Road Superintendent that Plaintiff was a problematic probationary employee. According to Defendants, Plaintiff's Road Department crew employees and members of the public reported concerns with Plaintiff's "performance, knowledge, professionalism, and efficiency to the Board of County Commissioners." Motion for Summary Judgment at 14–15. As a result of questions about Plaintiff's job performance and his effect on "department morale, efficiency, and work quality" the individual County Commissioner Defendants (Defendant Commissioners or Defendants) voted to terminate Plaintiff's employment. Defendants also claim, in part, that they could not have retaliated against Plaintiff under either the First Amendment or the Whistleblowers' Act because the individual Defendant Commissioners had no knowledge of Plaintiff's complaints about the Road Department's alleged misuse of public funds.

Defendants contend that they are entitled to summary judgment because Plaintiff cannot raise genuine disputes of material facts as to the required elements of either claim. "[T]o the extent any claim survives a typical Rule 56 analysis," the County Commissioners also ask for qualified immunity. Motion for Summary Judgment at 3.

### Pertinent Legal Standards

### I.      <u>Summary Judgment</u>

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.

*Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc*., 293 F.3d 1187, 1195 (10th Cir. 2002).

## II.    Qualified Immunity

When an individual defendant asserts qualified immunity, the procedure for analyzing this defendant's motion for summary judgment is slightly different. "The doctrine of qualified immunity protects public or government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant asserts qualified immunity, the plaintiff bears the heavy burden of satisfying a "strict two-part test." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation omitted). The plaintiff must establish 1) that the defendant violated a constitutional or statutory right, and 2) that the right was clearly established at the time of the defendant's conduct. *Courtney v. Oklahoma ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013).

"If the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity." *Hesse v. Town of Jackson, Wyo.,* 541 F.3d 1240, 1244 (10th Cir. 2008) (quotations omitted). But, if the plaintiff succeeds in carrying his two-part burden, the burden shifts to the defendant who must show there are no remaining material issues of fact that would defeat the claim of qualified immunity. *Walton v. Gomez*, 745 F.3d 405, 412 (10th Cir. 2014).

**Material Facts**[2]

***Plaintiff's Employment as Harding County Road Superintendent***

On December 30, 2013, Defendants hired Plaintiff as the Harding County Road Superintendent. Joint Status Report (JSR) Stipulation at 2 (Doc. No. 22). As a new-hire, Plaintiff was a "probationary employee," who had to complete a 183-day probationary period, during which time he was considered a terminable-at-will employee. Harding County Personnel Ordinance, at 8–10 (Doc. No. 91–1). On June 10, 2014, in a closed meeting, the Defendant Commissioners voted to terminate Plaintiff's employment. Plaintiff received a letter on June 14, 2014, that was signed by each of the Defendant Commissioners, stating that Plaintiff's employment was terminated effective immediately. JSR Stipulation at 2. The letter does not set forth any reasons for termination of Plaintiff's employment. Letter of Termination (Doc. No. 72–11). Plaintiff was still a probationary employee at the time his employment was terminated.

Qualifications for the Road Superintendent position included a high school diploma or GED Certificate, three to five years' experience in road maintenance repair and/or construction, and experience with budgets. The Road Superintendent was responsible for assisting the County Commissioners in prioritizing road projects, for reporting "road business" to the County Commission at meetings, and in approving all bills submitted for payment to the Clerk's Office.

---

[2] The Material Facts are undisputed unless otherwise noted.

The Road Superintendent reports to the County Commissioners. Defendant Commissioner Rebecca Smith Dep. at 23, 35, 114 (Doc. No. 90–1); Defendant Commissioner Nick Archuleta Dep. at 23 (Doc. No. 90–2). The Defendant Commissioners are the direct supervisors of the Road Superintendent. *Id.* In creating the position, Defendants intended the Road Superintendent's scope of duty to include oversight of the construction and maintenance of roads. Smith Dep. at 34–35. Once the Road Department receives funding, the Road Superintendent has a duty to keep "very close tabs on those funds." *Id.* at 36. But, the Road Superintendent is not expected to watch for or make inquiries into the County's potential misuse of public funds. *Id.* 38–40.

### *Road Department Budget Allocations*

In about February 2014, while working on the Road Department's budget, Plaintiff became concerned about the allocation of certain funds for road projects. Martin Aguilar's (Plaintiff's) Dep. at 80–81 (Doc. No. 72–2). Plaintiff believed there were specific monies left over from past road projects that he could apply to present projects; however, he was unable to locate these funds. *Id.* Plaintiff made inquiries about possible budget discrepancies to Patrick Thrasher, the Harding County Finance Director, and to Felicia Esquibel, the County Treasurer, but he did not receive answers to his questions. *Id.* at 82–83, 85, 87. When asked if he felt these types of budget inquiries were part of his duties as Road Superintendent, Plaintiff responded that he was responsible for his Department's budget and that he considered it his duty to make sure that his Department properly accounted for monies allocated to it. *Id.* at 83.

Plaintiff reached the conclusion that Defendants had obtained State funding for specific road projects and then had used those funds for other purposes. *Id.* at 83, 107. Plaintiff had no proof that the funds were utilized for projects outside the Road Department, but he was

concerned that certain road projects had not been completed and that there was no documentation showing how specific funds had been used. *Id.* at 84. Plaintiff followed up with Mr. Thrasher and asked for a printout of how certain funds were used, but Plaintiff did not receive the information. *Id.* at 88–89.

At a Board of County Commissioners' Meeting (Board Meeting), which may have been in February or March 2014,[3] Plaintiff asked the Defendant Commissioners about the allocation of certain funding for the Road Department, including the "capital outlay fund." *Id.* at 90–91, 92, 99, 101. Plaintiff believed that Defendants did not give him an adequate answer. *Id.* at 102, 105. Plaintiff contends that during a budget meeting, possibly in April 2014, he spoke to Defendant Commissioner Smith and told her that she needed to call the State Auditor and request an audit for the past ten years to see what "was going on with this budget." *Id.* at 107–08. In addition, Plaintiff asserts that during a basketball game, he talked to Defendant Commissioner Harold Mackey and told him that he needed to have the Road Department budget audited. *Id.* at 108.

The Minutes of the June 10, 2014 regular Board Meeting reflect that, several hours before the Defendant Commissioners met in a closed meeting and voted to terminate Plaintiff's employment, there was a lengthy discussion about how monies were tracked for road projects. June 10, 2014 Minutes at 2 (Doc. No. 72–4). Vanita Menapace, Defendants' administrative assistant, reported to the Commissioners that she was having a difficult time tracking money if it was not spent on specific projects and that "it was hard to figure out where the money has been

---

[3] At various points, both parties attempt to rely on the written Minutes from the regular Board Meetings as evidence that certain matters were discussed, *e.g.,* Plaintiff's inquiries regarding budget allocations, Defendant Commissioners' assertions that they received many complaints about Plaintiff's work performance, and Defendant Commissioners' contention that the Minutes "illustrate[] an ongoing process on intended improvement." *See, e.g.,* Reply at 12. In most instances, however, the Minutes are silent as to the matters the parties believe were discussed in the meetings. This may be because there were many meetings, including open and closed Board Meetings. Minutes may not have been prepared for closed Board Meetings, and the Minutes do not necessarily reflect every matter that was discussed. In addition, Plaintiff testified that while there were regular monthly Board Meetings, there were also "special meetings, pretty much once a week." Plaintiff's Dep. at 93–94.

spent." *Id.;* Smith Dep. at 158. Ms. Menapace suggested that "money in specific projects should be a separate item in the budget side to keep track of expenses." June 2014 Minutes at 2. Defendant Commissioner Smith pointed out that "General Fund money is put into the road department just to keep things running." Defendant Commissioner Harold Mackey stated that it "seems that [the] money from one project is being used when a problem develops on another road." *Id.* Plaintiff also discussed these budget tracking matters at the June 10, 2014 meeting. "An in house spreadsheet" was discussed as a solution. *Id.*

### *Plaintiff's Reports to State Auditor's Office*

On February 28, 2014, Plaintiff telephoned the State Auditor's Office and asked the auditor what he thought Plaintiff should do "to try to fix what was the problem." *Id.* at 109; June 20, 2014 Letter from State Auditor to Plaintiff (Doc. No. 72–9). Plaintiff contacted the State Auditor because he did not believe that the County Commissioners were going to address his concerns, which he characterized as a "big problem" that had been going on for years. Plaintiff's Dep. at 124, 138. Plaintiff felt he needed to contact the State Auditor to "make it right." *Id.* at 137. Plaintiff did not specifically request that the State Auditor perform an audit at that time, although he was seeking information about his concerns. *Id.* at 109. In March or April 2014, Plaintiff took some paperwork to the State Auditor's Office and met with Patrick Stewart from the Special Investigations Division. *Id.* at 110–11, 126; June 20, 2014 Letter (Doc. No. 72–9).

Once Plaintiff had left the documentation with the State Auditor, he did not inform the Defendant Commissioners that he had reported his concerns to the State Auditor. *Id.* at 125. However, Plaintiff told a number of his crew members that he had contacted the State Auditor. *Id.* at 138–39. It appears that Plaintiff again contacted the State Auditor on June 19, 2014, after his employment was terminated. June 20, 2014 Letter (Doc. No. 729). The June 20, 2014 letter

informed Plaintiff that the Office of Special Investigations Division had opened a case file regarding Plaintiff's complaints. *Id.* Ultimately, the State Auditor investigated the allegations and concluded that there was no wrongdoing. State Auditor Case Closing/Referral Report (Doc. No. 67–5).

Defendant Commissioners deny any knowledge of Plaintiff's suspicions or reports of misallocation of Road Department funds before June 10, 2014, when they voted to terminate his employment. However, all of the Defendant Commissioners had heard rumors that Plaintiff had threatened to make "future complaints" about the Road Department's budget and that Plaintiff knew someone in the State Auditor's office. Smith Aff. ¶ 26 (Doc. No. 67–2); Mackey Aff. ¶ 26; Archuleta Aff. ¶ 32. Defendant Commissioner Archuleta had heard a rumor several months before voting to terminate Plaintiff's employment that Plaintiff had claimed to the road crew he had made some type of report to the State Auditor. Archuleta Aff. ¶ 19. But, when Defendant Commissioner Archuleta questioned Plaintiff about this rumor, Plaintiff denied having made any report to the State Auditor. *Id.* ¶ 20.

### *Plaintiff's Work Performance*

Defendants claim that Plaintiff's work performance was clearly deficient. However, there is no written evidence that Plaintiff's work was the subject of many complaints by the public and by the Road Department work crew. For example, there are no write-ups, warnings, letters, memoranda, or complaints in Plaintiff's personnel file. Nor do the Minutes of regular Board Meetings reflect criticisms or problems concerning Plaintiff's job performance. *See* Board Meeting Minutes (Doc. Nos. 72–4 to 72–8).

Defendants contend that it is not necessary to document a probationary employee's performance issues because the "entire probation period is essentially a job evaluation."

Defendant Commissioner Smith's Dep. at 77–78 (Doc. No. 91–2). Defendants did not give Plaintiff an opportunity to improve his performance because "it [was] obvious to us that in this probationary period, we were trying the shoe on, and the shoe did not fit." *Id.* at 108. Defendant Commissioner Smith described the termination process as involving a choice between having an "uncontrollable, hothead supervisor or no crew." *Id.* at 143.

The Defendant Commissioners each signed almost identical affidavits in support of the Motion for Summary Judgment, stating that they received an "increasing number of complaints from the public" about Plaintiff's poor performance and "at the same time" had received "a significant number of complaints from many members of the road department crew." Smith Aff. ¶¶ 2, 3; Mackey Aff. ¶¶ 2, 3; Archuleta Aff. ¶¶ 2, 3. When deposed, the Defendant Commissioners identified some complaints about Plaintiff's work performance. *See*, *e.g.,* Smith Dep. at 49–55; Mackey Dep. at 13–20; Archuleta Dep. at 16, 18–21. However, the Defendant Commissioners' deposition testimony did not quite correspond with the Defendant Commissioners' affidavit statements. *See* discussion *infra*.

### Analysis

### I.    First Amendment Claim brought under 42 U.S.C. § 1983 (Count I)

The *Garcetti/Pickering* test governs the Court's analysis of a First Amendment retaliation claim. *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1367 (10th Cir. 2015). *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). That test consists of five elements:

> (1)whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5)

> whether the defendant would have reached the same employment
> decision in the absence of the protected conduct.

*Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014). "The first three elements are typically

questions of law (though they can turn on disputed issues of fact), while the last two are typically

questions of fact." *Seifert v. Unified Gov't of Wyandotte Cty./Kansas City*, 779 F.3d 1141, 1151

(10th Cir. 2015). Plaintiff bears the burden of demonstrating that the protected speech was a

motivating factor as to the fourth prong of the test; while Defendant carries the burden of

showing it would have reached the same employment decision in the absence of the protected

conduct at step five. *Id.* at 1158.

The *Garcetti/Pickering* test implicitly requires evidence that the public employer took an

adverse employment action against the employee. *Belcher v. City of McAlester, Okla.*, 324 F.3d

1203, 1207 n.4 (10th Cir. 2003). The Court need not discuss the issue of an adverse employment

action because Plaintiff's employment was terminated.

A. *Official Duties*

"[When public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes, and the Constitution does

not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. *See*

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (there is

no constitutional protection for speech that "simply reflects the exercise of employer control over

what the employer itself has commissioned or created.") (citation omitted).

> The official-duties question is a practical one that turns on "whether
> the speech was commissioned by the employer," and "reasonably
> contributes to or facilitates the employee's performance of the
> official duty (speech activities not protected because they "stemmed
> from and were the type of activities that [the employee] was paid to
> do").

*Seifert*, 779 F.3d at 1151 (internal citations omitted).

According to Defendants, Plaintiff's testimony that he considered it his duty to ensure that his Department properly accounted for monies allocated to it is clear proof that Plaintiff's complaints or reports about misallocated funds is unprotected speech made pursuant to "official duties." In addition, Defendants opine that Plaintiff's testimony supports a finding that Plaintiff himself considered his reports to the State Auditor to be part of his official duties.

Nothing in Plaintiff's written job requirements or responsibilities states that Plaintiff must provide oversight of the County's handling, use, or appropriation of County funds or that he must report any budgetary irregularities to a third party. Although Plaintiff was tasked with handling the Road Department's budget and prioritizing road projects in accordance with the budget, this does not mean that Plaintiff's official duties required him to inform the County Commissioners or the State Auditor of possible misuse of public funds. Moreover, Defendant Commissioner Smith concedes that Plaintiff was not expected to watch for or make inquiries into the County's potential misuse of public funds. *Compare Theele v. Bd. of Regents for the Univ. of N.M.*, No. CIV 07-294 JP [Doc. No. 78] (D.N.M. July 28, 2008) (this Court found undisputed evidence that a Campus Veterinarian and Director of the Animal Resource Facility was obligated to inform University officials of animal abuse occurring during animal experimentation; thus, the speech in question was made pursuant to the plaintiff's official duties).

The Court interprets Plaintiff's testimony and all inferences in his favor to support a finding that Plaintiff felt morally compelled, as a citizen, to speak out on possible financial improprieties. In other words, the Court finds that Plaintiff has raised at least a genuine dispute of material fact on the question of whether the speech in question was "commissioned" by his

employer and part of the duties Plaintiff was paid to do or whether the speech was made as part of the personal obligations Plaintiff felt he had as a citizen.

B. *Public Concern*

Defendants do not explicitly challenge this part of the test, other than to accuse Plaintiff of making "recklessly false" accusations of budget improprieties. Motion for Summary Judgment at 12. While the State Auditor ultimately found no "exceptions" regarding Plaintiff's allegations, the fact remains that the Auditor's Special Investigations Division, based on its initial review, found areas of concern that merited an investigation. The Court rejects Defendants' "recklessly false" argument and concludes that Plaintiff has presented sufficient evidence to support a finding that the speech in question raised matters of public concern. *See Erickson v. Bd. of Cty. Comm'rs of Cty. of Delta, State of Colo.*, 801 F. Supp. 414, 421 (D. Colo. 1992) (finding that speech related to alleged budgetary improprieties was a matter of public concern).

C. *Balancing Interests of Employer and Employee*

This part of the test balances an employee's interest in free comment upon matters of public concern against the state's interest in the efficiency of its public services. *Conaway v. Smith*, 853 F.2d 789, 795–796 (10th Cir. 1988). Defendants argue that due to Plaintiff's "consistently poor performance" and the growing number of complaints about Plaintiff's work, the County had a legitimate interest in terminating Plaintiff's employment in order to restore the Road Department's efficient operations.

The argument is unpersuasive, particularly here, where Plaintiff's First Amendment interest is entitled to greater weight because he was acting as a whistleblower in exposing possible improprieties with public funds. *See id.* at 797 ("Speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly

13

concerns vital public interests.") Moreover, in *Conaway*, the Tenth Circuit Court reasoned that "[i]t would be anomalous to hold that because the employee's whistle blowing might jeopardize the harmony of the office or tarnish the integrity of the department, the law will not allow him to speak out on his perception of potential improprieties or department corruption." *Id.* at 798 (citation omitted).

Admittedly, the County has an interest in maintaining efficient operations, but Defendants have failed to demonstrate how Plaintiff's speech actually impacted the efficiency of the County's operations. *See Brammer-Hoelter,* 492 F.3d at 1207 ("the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships"). Defendants do not allege that Plaintiff's speech impacted the inefficiency of departmental operations; rather, Defendants represent that Plaintiff's work performance was the problem.

Based on the evidence before it, the Court concludes that there are genuine disputes of material fact regarding whether Plaintiff's interest in reporting possible improprieties in the use of public funds outweighs Defendants' interest in the efficiency of department operations.

D. *Motivation for Termination Decision*

Defendants argue that Plaintiff's speech was not a motivating factor in Defendants' decision to terminate Plaintiff's employment because Plaintiff's reports were "secret." Thus, Defendant Commissioners had no knowledge of Plaintiff's reports or complaints about the budget before they decided to terminate Plaintiff's employment.

There are factual disputes whether Defendant Commissioners knew about Plaintiff's reports. Despite Defendant Commissioners' repeated denials that Plaintiff communicated

budgetary concerns to them, their virtually matching affidavits leave the door slightly ajar. For example, all three Defendant Commissioners concede that they had heard rumors that Plaintiff knew someone in the State Auditor's Office and that he "had made some threats to make future complaints." Smith Aff. ¶ 26; Archuleta Aff. ¶ 32; Mackey Aff. ¶ 26.

In addition, Plaintiff has raised genuine disputes of material fact regarding whether the Defendant Commissioners were aware of his inquiries about budget improprieties. Plaintiff testified that he discussed his concerns about the budget with Defendant Commissioner Smith and Defendant Commissioner Mackey on separate occasions, and that both times, he recommended to the Defendant Commissioners that an audit be performed. In addition, Plaintiff testified that he asked the Defendant Commissioners at a Commission meeting to "check into it [the availability of budget funds] and to see where those monies were, the funds were." Plaintiff's Dep. at 89–91. Moreover, Defendant Commissioner Archuleta admitted he had heard a rumor some months before Plaintiff's employment was terminated that Plaintiff "claimed to the crew that he made some type of report" to the State Auditor. Defendant Commissioner Archuleta represents that Plaintiff denied having made a report to the State Auditor and that Defendant Commissioner Archuleta believed Plaintiff. While the evidence is not strong, there is at least some evidence that Defendant Commissioner Archuleta was aware of Plaintiff's complaints about problems with the budget. Archuleta Aff. ¶ 19; Plaintiff's Dep. at 89–91.

Plaintiff also described various attempts he made to obtain answers to his questions about allocation of monies from County financial personnel.[4] While Defendant Commissioners

---

[4] The Court makes no findings as to the strength of Plaintiff's testimony or to his credibility, other than to conclude that he has offered sufficient evidence to create genuine disputes of material fact at the summary judgment stage. If, however, this case proceeds to trial, Plaintiff could face an uphill battle in view of his lack of specificity concerning whether Plaintiff told Mr. Thrasher, the Defendant Commissioners, or both about his budgetary questions. *See, e.g.,* Plaintiff's Dep. at 89–90. Moreover, if found admissible, Plaintiff's deposition testimony about his lack of candor on his job application could be damaging. *See* Plaintiff's Dep. at 61–64.

deny any knowledge of these communications, the Court observes that at the Rule 56 stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.*" Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It follows that if Plaintiff's allegations are believed, Defendant Commissioners were apprised of Plaintiff's budgetary complaints well before the decision to terminate Plaintiff's employment.

Because there is evidence showing that the Defendant Commissioners were aware of Plaintiff's concerns with possible budget improprieties, the Court concludes that genuine factual disputes exist regarding the Defendant Commissioners' motivation in terminating Plaintiff's employment.

   E. *Articulated Reasons for Termination Decision*

At the fifth step of the *Garcetti/Pickering* test, "the burden … shifts to the defendant, who must show by a preponderance of the evidence it would have reached the same employment decision in the absence of the protected activity." *Trant*, 754 F.3d at 1167. Summary judgment is appropriate if a reasonable jury could find that the plaintiff would have been terminated "even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech." *Id.* (citation omitted).

Defendant Commissioners presented forceful-sounding affidavits that they had ample reasons to terminate Plaintiff's employment strictly due to performance-related reasons. Defendants also argue that Plaintiff was "ineffective in his position," that he could not "competently complete his job duties," that he reduced department morale, performance, and efficiency, and that the department had fallen further behind schedule under Plaintiff's supervision. Motion for Summary Judgment at 11. Defendant Commissioner Smith described Plaintiff as an "uncontrollable hothead," while Defendant Commissioner Archuleta characterized

him as insubordinate. All three Defendant Commissioners testified that there were many complaints about Plaintiff from both the public and from Plaintiff's work crew.

But, when put to the test, Defendants' evidence of Plaintiff's deficient work performance is far less compelling than their affidavit statements leads one to believe. For example, it is undisputed that Defendant Commissioners did not write up Plaintiff about any of the complaints, nor did the Defendant Commissioners always address complaints about Plaintiff's work. *See, e.g.,* Smith Dep. at 49, 50 (complaints came up right before vote to terminate Plaintiff's employment); 88 ("did not address [complaints] right away" because hoping they "would come to an understanding"); Mackey Dep. at 38–39 (knew about crew management issue but did not address it with Plaintiff); 40 (did not address issue with Plaintiff because Plaintiff was "supposed to have known"); Archuleta Dep. at 27 (did not address work crew complaint with Plaintiff because Commissioner "thought it would work out"); 28 (same).

Moreover, in many instances, Defendant Commissioners were unable to identify the complainant or the date of the complaint. *See, e.g.,* Smith Dep. at 54 (there were "pretty much constant" complaints but Commissioner did not have specific names); 73 ("I don't' recall the exact date but I had numerous conversations"); 135 (did not recall who complained); 138 (do not recall who said Plaintiff was "floundering"); 138–39 (did not know who said Plaintiff was not doing a "very good job at running the crew"); 74 (complainant knew Plaintiff's work performance was generally poor because "she works at the grocery store" and "hears all the complaints from community members"); Mackey Dep. at 24 (knows there were "several complaints" but could not figure out who had complained); Archuleta Dep. at 24 (learned about complaints concerning "not very good [road] maintenance" from "just talking to people;" could not say who made the complaints).

In addition, a number of the "complaints" occurred during casual or chance encounters between Defendant Commissioners and various individuals. *See, e.g.,* Smith Dep. at 79–80 (spoke to road crew member, who was a friend of Commissioner Smith's outside the courthouse); 81 (road crew member stopped Commissioner Smith outside her home); Mackey Dep. at 14 (complaints were made by people who ran into Commissioner Mackey at church); 16 (received complaints from an individual while "probably at the gate where they were going in"); 27 (heard complaint from rancher while Commissioner Mackey was looking at some work on ranch); Archuleta Dep. at 16 ("happened to be in Logan" when ran into someone with a complaint); 19 (heard complaint while talking to someone at the post office); 26 (complaints by road crew but during "just conversations"); 32 (complainants did not come to him; they were "just conversing" and lived near the Commissioner).

With respect to the "significant number of complaints" by road crew members, many of the complaints appear to have been gathered from road crew members in a meeting on June 10, 2014, just before the County Commissioners voted to terminate Plaintiff's employment. Smith Dep. at 82, 115–17; Mackey Dep. at 27, 29, 34, 38. Indeed, the County Commissioners apparently "invited" some of the road crew to "hear their stories firsthand and to allow them an opportunity to bring to light some things that were happening in the road department that they had serious trouble with." Smith Dep. at 116–17. Defendants' evidence about complaints from chance encounters with community members and from road crew who appeared at Defendant Commissioners' invitation is not compelling evidence.

Moreover, Defendants' failure to document <u>any</u> of these "serious" performance failures, multiple customer and work crew complaints, and various infractions, including Plaintiff's insubordination and volatility, undercuts Defendants' position that they were planning to

18

terminate Plaintiff's employment solely for performance-related issues. The fact that Defendants made little effort over a period of six months to address numerous, significant concerns about Plaintiff's performance downplays the seriousness of the issues. *Compare Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cty.*, 587 F.3d 1223, 1244 (10th Cir. 2009) (finding the defendant established the fifth step of the *Garcetti/Pickering* test where it supplied evidence of an investigation, independent outside review and internal review, recommendations, and appropriate corrective action); *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 117 (2d Cir. 2011) ("undisputed evidence of the plaintiff's insubordination and the employer's <u>ongoing efforts to address it</u>—efforts beginning well before any allegedly protected conduct—' were sufficient to meet the defendants' burden at the summary judgment stage) (emphasis added).

The Court finds genuine disputes of material fact as to the fifth element of the *Garcetti/Pickering* test and also concludes that Defendants have failed to carry their burden as to this element of the test. Thus, for all of the above stated reasons, the Court will deny summary judgment on the First Amendment claim (Count II).

## II.      Whistleblower Act Claim brought under NMSA § 10-16C-3 (Count II)

The New Mexico Whistleblower Protection Act prohibits a public employer from taking retaliatory action against a public employee when the public employee, for example, "communicates to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act." NMSA 1978 § 10-16C-3. The Whistleblower's Act provides an affirmative defense to an employer who takes action due to an employee's misconduct or poor work performance, or for any other legitimate business purpose. NMSA 1978 § 10-16C-4.

Defendants argue that they are entitled to summary judgment on this claim for the same or similar reasons they offered in support of summary judgment on the First Amendment claim. Motion for Summary Judgment at 13–14. Defendants again state that they did not know about Plaintiff's communications to third parties and, therefore, could not have retaliated against Plaintiff for conduct about which they did not know. In addition, Defendants assert that they are entitled to the affirmative defense because they had legitimate, business reasons to terminate Plaintiff's employment, including knowledge of multiple complaints about Plaintiff's work performance.

For the reasons described at length, *supra*, the Court finds genuine disputes of material facts as to Defendants' position that they were unaware of Plaintiff's complaints or reports of budget improprieties and with respect to Defendants' stated reason for the termination decision. Therefore, the Court will deny summary judgment on the Whistleblower Act Claim (Count II).

### III.    Qualified Immunity

Defendants argue that if Plaintiff's claims survive a "typical Rule 56 analysis," the facts illustrate that the individual Defendant Commissioners are entitled to qualified immunity. Motion for Summary Judgment at 3. Defendants summarily assert that, even if Plaintiff could illustrate an actionable claim, "there would be no clearly established law holding that an individual could not be terminated under these circumstances." *Id.* at 12. Thus, according to Defendants' briefing, they raise "the clearly established law argument under the qualified immunity analysis." *Id.*

Other than these few sentences, Defendants present no argument in support of qualified immunity in their opening brief. In the Reply, they again briefly contend that there is "no

authority clearly establishing that an employee[5] could not take action based on conduct the employee believes is part of his official duties. Therefore, qualified immunity applies as well." Reply at 9. In their Supplemental Brief, Defendants state that, "[i]n the alternative, there is no clearly established law in the Tenth Circuit which would allow plaintiff to make a claim that filing a false report, in his self-defined official capacity, would violated the First Amendment."[6]

Plaintiff does not address the qualified immunity argument in briefing. However, Plaintiff fully addressed the merits of the First Amendment retaliation claim and raised sufficient genuine disputes of material fact to defeat Defendants' request for summary judgment. *See Hook v. Regents of Univ. of Cal.*, 394 F. App'x 522, 533–40 (10th Cir. 2010) (Court addressed qualified immunity argument by analyzing the plaintiff's First Amendment retaliation claim and the five elements of the *Garcetti/Pickering* test).  Defendants' assertion of qualified immunity is premised on the same grounds that the Court already rejected in analyzing Defendants' request for summary judgment.

Moreover, there was clearly established law in 2014, when Defendants terminated Plaintiff's employment, which prohibited a public employer from retaliating against an employee for exercising constitutionally protected speech. *Garcetti*, 547 U.S. at 417; ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."); *Dill v. City of Edmond, Okla*., 155 F.3d 1193, 1201 (10th Cir. 1998) (a public employer "cannot retaliate against an employee for exercising his constitutionally protected right of free speech."). Thus, the Court concludes that genuine disputes

---

[5] Defendants may have intended to say "employer" rather than "employee." Although the argument is unclear, Defendants' position appears to be similar to the one they urged in opposition to the First Amendment claim, *i.e.,* that an employee's speech related to his official duties receives no constitutional protection. The Court already found genuine disputes of material facts in terms of whether Plaintiff was acting in accordance with his official duties or in his capacity as a private citizen. *See* discussion *supra*.

[6] This argument, as stated, is also unclear. Presumably, Defendants again are arguing that because Plaintiff filed a "recklessly false" report with the State Auditor, his speech does not address a matter of public concern. The Court also rejected this argument. *See* discussion *supra*.

of material fact preclude a grant of qualified immunity to the individual Defendant

Commissioners as to the First Amendment claim.

Defendants do not expressly request qualified immunity on the state law Whistleblower

claim, although their request may be read to seek qualified immunity on both claims. *See*

Defendants' Supplemental Brief at 9. The defense of qualified immunity applies only in

instances where a violation under the federal Constitution is alleged. *See Hesse,* 541 F.3d at 1244

(analyzing qualified immunity question in terms of whether there was evidence of a deprivation

of a federal right). Accordingly, the qualified immunity defense does not apply to a state law

Whistleblower claim. *See, e.g., Gossman v. Allen,* 950 F.2d 338, 341 (6th Cir. 1991) (defense of

qualified immunity was not available on Kentucky state law whistleblower claim).

IT IS THEREFORE ORDERED that DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT AND QUALIFIED IMMUNITY (Doc. No. 67) is DENIED and that

PLAINTIFF'S OBJECTION TO DEFENDANTS' EXHIBITS ATTACHED TO THEIR

SUPPLEMENTAL BRIEF IN SUPPORT OF SUMMARY JUDGMENT IN VIOLATION OF

D.N.M.LR-Civ. 10.5 (Doc. No. 92) is DENIED.

_____

SENIOR UNITED STATES DISTRICT JUDGE